Good morning everyone, and we'll call the first case on our calendar. It's the case of New York Hayes and Aquila Fogel versus Philip E. Harvey. Ms. Garland. Good morning. My name is Rachel Garland and I represent the Hayes family, the plaintiff appellants and tenants in this case. I'd like to reserve two minutes for rebuttal. That request will be granted. Thank you. The question before you this morning is whether the Hayes family's landlord can choose not to renew the Hayes family's lease at the end of their lease term without good cause. The Hayes family rent their unit with the assistance of an enhanced voucher. This is a relatively recent, relatively obscure federal subsidy. In 1999, Congress enacted the enhanced voucher statute specifically to prevent the forced displacement of subsidized housing tenants such as the Hayes family when their landlord decided to no longer continue with the federal project-based subsidy program. This was to allow select tenants to remain in their home at that point. We believe that the plain meaning of the enhanced voucher statute allows for a right to remain for the Hayes family that is not broken by the end of the lease term. Under the statute, there is only two ways in which an enhanced voucher is extinguished. The enhanced voucher is not transferable out of the property and the enhanced voucher is not transferable to another tenant family. Now in 1990, you cited it, 1999. Didn't Congress add the words during the term of the lease? Well, so the statute was amended just a year later because Congress realized within a year that the way they had worded the 1999 statute didn't clearly give a right to remain. And so a year later in 2000, they amended to say that the assisted family may elect to remain in the property. So isn't that language in the statute during the term of the lease? No, that language is not in the statute. Excuse me one moment. Of all things to bring to the podium, the statute would be good. No, the statute specifically says that the assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event for the project. Where are you reading from? So this is 42 U.S.C. 1437 F.T., which is the enhanced voucher statute. Yeah, but what about F07? F07C. Right, so subsection O is the regular voucher statute. So subsection O outlines all of the terms and conditions of the regular voucher program. 1437 F.T., subsection T. When you say regular voucher, you're referring to tenant-based assistance? Correct. And your client's not on tenant-based assistance? So again, this is a very obscure subsidy type. In the realm of federal housing, there's federally subsidized housing, there's public housing, there's Section 8 project-based, and there's Section 8 voucher. Those are the three main types of subsidized housing. Of the regular subsets of tenant-based vouchers called enhanced vouchers. And this small subset represents, we don't have exact numbers, but if you look at the amicus brief filed by the National Housing Law Project, their first footnote estimates, based on numbers that HUD has given out, that at most, there are 100,000 of these currently in existence, or that have even just been issued. They may no longer be in existence. And is there a HAP contract here? There is. And does that dictate the legal rights and responsibilities of both landlord and tenant here? It dictates some of them, but it's governed by the statute. The statute controls over the language of any particular contract. Is there a conflict here between the HAP contract and the statute? No, the HAP contract, so there's no conflict between the statute and actually the lease. Where the conflict comes in is that it is not clear from the addendum that the Housing Authority had the tenants and the landlord signed in this particular case. Unfortunately, the Housing Authority didn't have an enhanced voucher specific addendum, so they just had them sign a regular voucher addendum. So what does the lease say here? What's the lease term? The lease term is a two-year term. It was initially a one-year term, and then it was renewed on a two-year basis. So it's your argument, then, that the enhanced voucher statute alters the term of the lease? My argument, I think, more specifically would be that under a regular voucher lease, and under subsection O... No, just under this. Under this lease. Under this lease, then at the end of the lease term... Is that two-year lease term invalid, I guess, under the statute? No, the lease term is still valid because every two years you can renegotiate certain terms of lease. The only thing that you can't do at the end of the two years is evict without good cause. So the lease requires the landlord to renew it every two years? Yes. Well, it automatically renews every two years. If a landlord wants to request an increase of rent, they can do that every two years. The Housing Authority readjusts the subsidy amount every two years based on the tenant's income. So every two years, the Housing Authority takes stock of are there any changes that need to be made to the lease, but a landlord can't choose not to renew the lease. So let me ask you about good cause. As I see it, as it applies to the enhanced voucher, there are two ways in which good cause could be argued. I presume you'd say maybe not net, right? The relative exception, I'll call it, the daughter, and the right to renovate. If I'm understanding this correctly, with regard to the right to renovate, there's no economic disadvantage to the landlord because whatever increased value that the unit has as a result of the renovations are made up by the enhanced voucher. Correct. Okay. So I take it that one of the possible scenarios here is that the question of the sort of veracity of the daughter exception would mean that if we said that the enhanced voucher, I'm sorry, if we say that good cause at least has been well argued so that there's a question of fact as to whether the reason the landlord is doing this is the daughter, that would have to go back and then there'd have to be specific findings with regard to the veracity of that argument. Because as I understand the state of the record, there's some question based on the timing of when the landlord brought the daughter into the fray, if you will, and whether the daughter is in fact, is she a tenant, she's not paying rent, she may pay rent at some point and so forth. Is that one of the scenarios that would be applicable here, sending it back for findings with regard to the daughter? Because I take it then just to sort of spin it out, that if it did go back and there was a finding by the district court that there was a veracity to the landlord's putting his daughter up or putting the daughter into the apartment, that that would be a basis to evict the Hayses. Correct. So we never, on the district court level, got to whether or not there was good cause. We filed cross motions for summary judgments alleging that good cause was not required. Sorry, our position is that good cause is required to choose not to renew a lease and that the landlord in this case didn't show sufficient good cause. The district court opinion only answered the question saying that good cause wasn't required and therefore they didn't even look at whether or not there was good cause. So one option for this court would be to determine that good cause is required and then remand to the district court to determine whether or not the landlord has good circumstance. Should I continue? We believe that the statute, the plain meaning of the statute, is that the right to remain does not extinguish, there's no time limit placed on the right to remain, and that a change in ownership does not extinguish the right to remain under the statute. We believe that the plain meaning of the statute has been upheld unanimously by the five circuit, sorry, the five district court opinions and the three affirming circuit court opinions that have dealt with a right to remain tenancy. In that limited jurisprudence, none of which is of course in the third circuit, the courts have looked at the legislative intent. All of them have determined that the plain meaning of the statute is so clear that they have issued injunctions upholding the tenant's right to remain. Well, it would undermine the entire scheme, right, if you were allowed without a showing of good cause to put tenants out willy-nilly, right? Correct. And so that's what the courts determined. They looked to HUD guidance only so far as the owners actually asked them to rely on the HUD guidance, and the HUD guidance has been clear over the past 17 years. While there have been no final rules that have been issued, HUD has issued a notice, they've issued a renewal policy that discusses all of the practical elements of the entire enhanced voucher program from opt out to lease up of the tenants, and has sent two letters, one to housing authorities across the country and one to owners across the country, specifically spelling out what they need to do. Is there any argument that there should be more deference than skid more deference? And if so, what's the articulation? Right. So because none of this is a final regulation, Chevron deference is a possibility, but it's not, you know, necessarily going to be Chevron deference. The way the courts, the courts never had to reach what level of deference to give the regulations because they said the statute is so clear that even if you owner were right in saying that HUD guidance upholds your position, and we were to give it had to say we think it needs skid more deference and we think it needs Chevron deference. I think possibly our deference because you're discussing how an agency interprets its own rules and regulations. Here they're not necessarily interpreting a rule or regulation, but regardless of what type of deference you provide it, the HUD guidance has been consistent, it has been clear, and it has been reasonable with the statute over the past 17 years. The proposed rule, which you the outcome of this case. There's nothing in the proposed rule that goes against the HUD guidance that has happened over the past 17 years. In fact, the proposed rule says that it seeks to codify existing HUD policy, which clearly says that an owner must continually renew and enhance after family lease. Are we able to take any judicial notice of it? It seems like it's kind of in a nebulous state right now, the proposed rulemaking. I mean, we wanted sort of a point of information, but there's no way for us to incorporate that into our rationale, reasoning here, right? That would be up to you as to whether or not you want to afford it skid more deference. It is an issuance by HUD. We think that the prior issuance, which has been in existence for the past 17 years, is equally deference. You should give it equal deference as the proposed rule. The proposed rule is not in effect right now. HUD specifically requested feedback on the language of the proposed rule, so we anticipate that if and when HUD issues a final rule, the language might be significantly different than it currently is. You may have answered this in response to Judge Greenaway's first question, but why isn't, if you're correct on the good cause requirement, why doesn't Harvey's desire to renovate provide good cause? It might, and so that would be a question for the court. Again, we never got to that because the district court said the good cause wasn't required, but we think that the landlord and the tenants can work together to ensure that the renovations happen. Any renovations that the property, and the housing authority and subsidy will have to rise in accordance with that. So if he does a lot of work and makes it a really, really fancy place, the government might have to pay $10,000 or $20,000 a month in rent? Well, he's done significant work, as the record shows, on the two similar properties right on either side of the Hughes family's property, and he seeks to rent those out for $4,000. I think he gets $3,700, $3,800 for them, and yes, the housing authority would pay that amount. So if he does a lot of work and makes it really fancy and the market rents $20,000 a month, then the government has to pay that? That's not the facts before us. It's an interesting question. No, I'm asking if he does, I mean, we're talking about renovations, right? And who knows what, you know, people do strange things sometimes to their properties for good or for ill or who knows why, but if he put a ton of money into the property and made it really fancy, you're saying the government would have to pay market rent, even if it's a really high rent? Yes. So let me take that a step further, because I think there was an interim question that Judge Fischer was asking. I presume that literally during the period of renovation, you know, you just revert to landlord-tenant law. You know, landlords renovate places all the time, and if it requires displacements for some period of time, it gets worked out. So that's really not an issue that we need to resolve in our thinking about this. No, not at all. So the only question really is, right, okay, is the landlord going to be subject to any economic disadvantage as a result of that? Landlords are not put at an economic disadvantage. I mean, obviously, Brother Hardiman's hypothetical of, you know, $20,000, I want to live in a $20,000 apartment. But, you know, other than, you know, an outlier like that, because, you know, query whether the government would come up with that. But other than an outlier like that, the government pursuant to is supposed to cover that deficit so that there is no disadvantage to the landlord, right? Correct. I mean, that's the beauty of the Enhanced Voucher Statute. Under a regular voucher, so subsection O that you were referencing before, the Housing Authority has the ability to cap a voucher subsidy. So for Philadelphia, for a four-bedroom, that's capped at $1,500, including utilities. I want to take you back to that section again. Why at page 13 in the District Court's opinion, why isn't the District Court correct when it said, significantly as noted by the Ninth Circuit Court of Appeals in Barientos, the current version of 143707C was part of a number of amendments to the statute intended to eliminate the so-called endless lease provision by removing the good cause requirement for non-renewal. Why isn't the District Court correct on that? Unfortunately, the District Court failed to read that paragraph in context of the Barientos decision. So the endless lease provision for the regular voucher statute, so for subsection O, was repealed by Congress in 1996. Three years later, Congress enacts the Enhanced Voucher Statute. Yeah, but T doesn't say what you said it says. T says... You're arguing that it says something, and you're arguing that this doesn't apply to the Enhanced Voucher. So T says, so three years after repealing the endless lease provision, Congress says, we're going to carve out a subsection of regular vouchers, and we're going to call them Enhanced Vouchers. They're going to be like regular vouchers in all respects, except two important respects. But where does it say that, that it's an endless lease? Where does it say that it... Where does it say in that endless voucher language that this endless lease requirement continues? So it says that the, so subsection B, the assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event for the project. So this is actually addressed, your question was addressed specifically by the other circuit court decisions. And so if you look at, so if you look at the first case to deal with the issue, Jinty, from 2004, the landlord also raised this issue. That wasn't a circuit court decision. No, that was the Southern District of New York. Correct. And they looked at the timing of the congressional decisions, and they looked to see that first provision. And then three years later, they create this right to remain for enhanced voucher tenants. Estevez in the Eastern District of New York also did a similar look at the congressional... So you're citing the district court decisions for your proposition. Well, the other site that might be interesting to look at is in the Variantis decision. The circuit court requested that HUD issue an amicus brief to talk about the preemption issue. And in footnote five of HUD's brief, HUD says, HUD promulgated its good cause regulation well before Congress created the enhanced voucher program. And that regulation is not intended to deny enhanced voucher tenants the right to remain in the same project that is guaranteed by the statute. So going back to your question of what level of deference, we believe that, and our specifically says this, that when an agency issues an amicus, it's not involved in the litigation as a party to the litigation, but it issues an amicus, that should be given our deference because it is an interpretation, it's the agency's interpretation of its own rules and regulations. Okay. We'll hear from Ms. Randazzo and then we'll have you back. Thank you. Ms. Randazzo. Good morning. May it please the court. My name is Susanna Randazzo on behalf of Appellee Philip Harvey. Your honors, appellant's argument that the right to remain extends into perpetuity and that good cause is required is flawed for a couple of reasons. Number one, if you look at the statute itself, section T1437FT, it starts out by saying that under this section for a family shall be a voucher assistance under subsection C. So for all intents and purposes, enhanced vouchers are identical to a regular voucher with the exception that they have additional, I guess... More money, a lot more money is available. And that's a big deal, right? Because most folks that are on a section 8 voucher aren't going to get the housing authority, give them two or three or 8,000 a month. Correct. So that's a big benefit that it's an additional amount of money. But that is what makes it, that distinguishes it from a regular voucher program. And isn't there another important distinction though, which is if a developer converts a project, a developer does a project-based development, they get incentives to do that, they build it in the 70s or the 80s, and then after the sunset period, after 20 years, they want to get out of that arrangement, they have to give at least a year's notice to the folks that were living there for 20, oftentimes for 20 years, right? Correct. And that's not typical in a typical section 8 or other tenant-based... Correct. It's not because if you, if we're going to compare apples to apples here, and in a regular voucher program, the property owner bought the property at market rate, and there was no, there was no, it was never a project-based development. Here, in enhanced vouchers, the original owner, in this particular case, Pine Street Associates, had a loan with the government, and after that 20-year period, or honestly, we don't even know, because my client was not privy to any contract. At one point, we understand now looking at, after this lawsuit was filed, and looking at certain documents that was submitted, that were submitted by appellants, we are now aware that the former owner submitted a one-year opt-out letter, meaning that he either paid his loan or his 20-year period had expired. Again, we don't know. And at that point, the one-year notice was sent. And which is really important... But then he chose to renew this tenant's lease, though, right? Then... A couple of times. Appellee purchased the property. So remember, the opt-out period occurred in 2008. But then that ran its course and nothing happened. And nothing happened. And the landlord and tenant relationship continued as it had before, albeit on a different voucher, because this was no longer project-based assistance. Correct. Okay. But when your client buys the property, I guess, I mean, she can argue for herself, but I think the argument from the other side is your client bought that property, eyes wide open, with the lease attached to that property. Was that correct? And that actually is a valid point, Your Honor. When my client purchased the property, first of all, there was no... They did a title search. There was no deed restrictions, nothing saying that this is a project-based... The only thing that was presented to them was the HAP contract. And the HAP contract... So he thinks he's buying it free and clear of all liens and coverages. That's what the deed says. That's what the deed says. But he knows there's a lease and a HAP contract with a tenant on public assistance who's in the residence, right? Sure. And just like any Section 8 tenant, there is a lease term. No, but I'm not sure that you can make the statement that it's just like any other Section 8 person, right? Because here, your client, if I'm understanding the enhanced voucher, is never going to suffer an economic detriment. I disagree, Your Honor. Okay. Give me a scenario where your client suffers an economic detriment. Because my understanding, and you're going to help me with this in a moment, is that... You know, just pick some numbers. If your client's... If the lease is at whatever, $2,000, he wants to do renovation and bring it to $3,000, right? Because with the renovations, that would be the new market, the new floor. That with the enhanced voucher, the government would make up the deficit. So he'd still be in a position in that scenario to get $3,000 a month. So tell me the economic detriment. Your Honor, if you look at the statute, it's an assumption, and I believe that the appellant is also assuming that the government is going to take whatever rent is charged. The statute says reasonable rent. It hasn't been determined. So now you have a situation where the landlord here makes renovations. Let's say he wants to make this property better than the other property where he's getting over $4,800, and this one, he wants to make it where he's getting $6,000 a month. PHA or the local HUD and the local housing authority have the right to look at the rent and determine whether or not it's reasonable. As a matter of fact, appellant counsel tried to offer assistance before this case came about to help them go through the PHA and make sure that they would... Or help them almost... I'm sorry, help them go through the process of having the housing authority approve it as market rate rent. So it is... That's not the facts we have here, is it? Are they? But my point, Your Honor, is that it's an assumption. It is an assumption that all the renovations are made, and it is an assumption that the housing authority and HUD will accept the rent as reasonable. So we can have a scenario where renovations are made, and the renovations exceed what the housing authority find to be reasonable rent, and now we can only charge what the housing authority finds to be reasonable. Do you have a right to appeal that or challenge that, or are you kind of at the mercy of what they deem to be the reasonable rent? We have not approached that, Your Honor, but I would think that then there's more cost. But that's a better lawsuit. It's just not this lawsuit. It's not this lawsuit. So in the future, you might have that lawsuit, and she may concede on that lawsuit. I don't know. But in this lawsuit, that's not what you have. And I mean, I guess that brings us back to good cause. And you'd make the argument that the right to renovate provides the good cause, but the comeback would be what's the detriment? And what I'm hearing is there's a hypothetical detriment, but we don't have any facts from which we could say, and maybe this is another reason why it should go back. Your client hasn't been able, hasn't been given the opportunity to say, well, look, I want to do renovations that would bring it to $6,000, and I'm just making numbers up. I know that this is just hypothetical for the moment. But I want to bring it to $6,000. PHA leads me to believe they're only going to pay $4,000. And that gap provides the good cause that I should be able to put the HACES out. And under that scenario, to what extent does a landlord who purchased this property at market rate without any loan from the government, to what extent does he have to go to prove now he's got to, under that scenario, if we could just go back, now in order for him to prove good cause, it's not good enough for the appellant, good cause that he provided in terms of having his daughter wanting to move in, in terms of renovations, it's not good enough. Now he's going to have to hire lawyers to, under that scenario, Your Honor, to go fight what is reasonable rent. And that brings us back to Appellee's argument that good cause is not required in this particular case. And again, in terms of the history of enhanced voucher- What would be the purpose of the 2000 amendment? Why isn't good cause required? That's where you started out. Yes. You started out to say that the enhanced vouchers were different, but you said there were two reasons. So good cause is not required because if you look at the statute, the statute says that enhanced vouchers are similar to regular vouchers, with the exception that there is more, the rent could be market rate and could be higher than regular rent, or the subsidy, I should say. And also the fact that the tenant may elect to remain at the time of opt-out. The opt-out at this particular occasion occurred in 2008. Why would Congress say- All right. But wait a minute. Wait. Okay. But if we accept that argument, that means that when your client bought the property, they wouldn't have to give the one-year notice to the tenant and they could send them out almost immediately. Is that your argument? Yes, Your Honor. Under the statute, the one-year opt-out is required by the project-based owner. Why shouldn't we read the one-year opt-out to require that any time the successor owner, like your client, is also required to give a year's notice? I mean, isn't that consistent with the language and the intent of the statute that folks that were... I mean, there's an important distinction here underlying this. I think you'd agree between project-based assistance and tenant-based assistance. Because if you start as a tenant-based recipient, you know that you may be on the move, right? You've got to find a landlord that accepts the tenant-based voucher, et cetera. But if you're a project-based beneficiary, there's a substantial likelihood that you've been living... This has been your home for 10, 20, 30 years. So why shouldn't we read that one-year provision into that? First of all, Your Honor, in 2010, when my client purchased the property, it was no longer a project-based. I think we are all in agreement that... Yeah, I agree with you on that. But we do have enhanced voucher tenants. And as I read the statute, enhanced voucher tenants are entitled to one year's notice so that they can arrange their affairs and find another place to live without having their lives disrupted. To that, Your Honor, number one, the statute provides that the one-year notice is to be given by the opt-out landlord. Opt-out meaning that at the time of conversion, meaning the property is no longer project-based. It is now becoming tenant-based. So you're saying under the statute then once that opt-out period comes and goes and the tenants get renewed under tenant-based voucher, albeit an enhanced voucher like this one, then the rules of the game are whatever the lease and the HAP contract provides. Correct. And, Your Honor, if you look at actually the district court in this particular case also found that even assuming, arguing that the one-year notice is required, the one-year notice expired. The original notice to evict letter was sent out in February. Well, in fact, your client sent that one-year notice, right? Yes, your client sent that. No, not the one-year notice. No, my client sent out the regular letter in February of 2015 ending, terminating the lease. Which gave them how much time to arrange their affairs and find another place. Based, right. And their lease ended at the end of April. How much time? It gave them at that point, their lease expired at the end of April, so it gave them a couple of months to go find it. Who gave the one-year notice? The one-year notice was given, and again, this is my understanding after this litigation, by the Pine Street Associates, which is the former project-based landlord. So was that just an, I was under the impression that maybe it was an accommodation as part of this litigation that your client said, look, we'll let you stay for another year, or did that not happen? No, that did not happen. We gave them the requisite pursuant to the lease, the requisite notice to vacate the unit at which point. But they're still there. They're there because of a stay. They're there because of a stay. Okay, all right. Right. So the one-year opt-out notice was given by the former landlord. What the district court judge found is that just to make things easier, she waited until her order was issued so that it gave the Hayes family a year notice for when the original letter from my client was sent to the tenant. So let me ask you this question. HUD has interpreted the statute to provide for a right to remain extending beyond the year. What kind of deference should we give that? That, again, goes to HUD's requirement that beyond the one year, they are required to pay the enhanced subsidized rent so that if a tenant wishes to remain and there's no other issues the tenancy hasn't terminated or there's no other good cause, HUD is required to pay the enhanced subsidy. So that really goes to- I don't understand. So are you saying that the good cause thing is different than the tenancy expiration? You're saying good cause is only triggered if the landlord seeks to evict someone during the pendency of the lease? Correct. But you're saying termination of the lease is an independent reason where the landlord can put in whomever he or she wants? Yes. So if you have a two-year lease, you agree that during the term of that two-year lease you would be required to give good cause? Yes, Your Honor. Or there's other reasons, criminal activity. Yes, other reasons. Exactly. Well, then please tell me what right to remain is. Because right to remain can't, by definition, apply to the period of the lease. Let's just say two-year lease. The right to remain that's alluded to here can't be zero to 24 months, right? So we agree on that, right? Correct. Okay. So then that must mean that it extends beyond that, right? So tell me why it doesn't make sense for us to say, as you go from lease period to lease period, the right to remain can only be altered by a showing of good cause. Because if that's not the case, then I don't understand what the purpose of right to remain is. Your Honor, the right to remain, that triggers at the moment of conversion. So this property was originally a project-based development. In 2008, my understanding is that the former landlord opted out of being a project-based landlord. What the statute provides is that at the time of conversion, when this period, this opt-out period comes to be, at that point, if a tenant wants to remain in the building or in the unit, they have the right to remain, and the federal government is to pay the enhanced subsidy. They have a right to remain if they want to at a time of conversion, and HUD is required to pay. So you interpret right to remain to come into being at only one point in time, and that is at the point of time of the conversion? Yes, Your Honor, because otherwise... But is that what... That's not how HUD has interpreted the statute. That's what I don't understand. Actually, no, HUD has interpreted, and if you look at even case law, all the cases that were even cited by the appellant, the right to remain, and if you even look at their advisory, their proposed rule, their right to remain is at the time of conversion, and that makes sense because otherwise HUD would not pay the enhanced subsidy. That's why the right to remain is at that point. In other words, under the normal voucher, there's a cap as to what HUD will pay in terms of subsidizing the rent. But if you were right, that would mean that the number of people on enhanced vouchers should be dwindling every year because there'd only be one point in time for which HUD would pay the enhanced voucher for the following lease period, and then at the end of that lease period, the enhanced voucher for that family should end. No, I disagree to the extent that what the statute is saying is that if the family wishes to remain and the other provisions don't apply, the landlord doesn't want to evict, but let's just assume for the moment that the landlord is happy with the tenant. The tenant wants to remain. The statute is saying that HUD has to pay the enhanced subsidy up until the point that either the tenant chooses to leave, the lease terminates, there's other good cause. So really, the duty is upon HUD because otherwise HUD wouldn't be paying. It's not typical. HUD doesn't pay for subsidies for people to be living in Society Hills or Society Hill or Rittenhouse. They don't do such things. And so what the government is saying or what HUD is saying is you, HUD, if the tenant wishes to remain and the landlord, I mean, and all the other things apply, you, HUD, have to pay the enhanced voucher, which they wouldn't normally pay. So that's why it's called an enhanced voucher. That's why it's putting the burden on HUD to pay the enhanced voucher. But if HUD is paying it, right? They wouldn't be paying it otherwise, Your Honor. They would not be paying an enhanced voucher otherwise. They would just be going to their regular schedule. And in this case, I think it's $1,500 as opposed to $2,400. They would not otherwise be paying an enhanced voucher if this was a regular voucher. No, I get that. That's not what the question is. The question is when do we stop it, right? You want to stop it after that first lease term. And my rejoinder is HUD is obviously not. HUD is saying that the right to remain, at least the way I'm looking at the statute and the regulations, HUD is saying that it extends beyond that. But I think we've gone back and forth. Okay, Mr. Indezza, thank you very much for your arguments. And we'll have Ms. Garland back on rebuttal. I just want to start out by saying that none of the arguments raised by Apelli are new arguments. HUD has been dealing with these concerns by owners for 16 years. The district court and circuit court opinions, all of these issues are raised in those cases. And all of those cases unanimously find that tenants have a right to remain vis-a-vis both HUD, but in these cases, vis-a-vis the owner. Except for this case. Except for this case. Okay, you can't say all of them. Right. So this is the case that breaks with the statute, with HUD guidance, and with the other district and circuit court opinions. Judge Hardiman, to go back to your point, the one-year opt-out notice, and this I actually agree with the Apelli, the one-year opt-out notice is a notice requirement specifically for the project-based landlord when they are opting out of that project. So it is not, once you become an enhanced voucher tenant, the notice then goes to whatever the lease requires for notice. The district court opinion got that wrong. The district court opinion said, you need the one-year notice for the enhanced voucher tenant also. Wait, I'm sorry, you went a little too fast for me there. The opt-out occurs at the time that the developer of the project wants to exit the project-based program. Right, and one year before doing that, they have to send a very step-by-step required letter to the tenant saying, a year from now, our project-based contract expires. Right. At that point, HUD will give you enhanced vouchers. You may use those to remain in the property. Right, but doesn't that depend on whether the landlord wants to continue with public housing residents or to go into the private market? There's nothing... No. Is there something in that opt-out letter that compels the project-based owner to continue to offer that unit as public housing ad infinitum? Yes. And what language requires that? Well, the statute specifically refers to the statute. Just read the language that says that the project-based owner, when leaving the project-based program, is required to continue it as public housing ad infinitum. Or not that they're using those Latin words, but in perpetuity. Right. So one moment, and let me pull up. So we actually, in the record, have the letter that was sent. No, the language of the statute that requires that. The statute. Oh, the language in the statute. Is there... I'm not aware of a statute that requires that. That's why I'm asking the question. That's what my original question was. Right. So the language of the statute, again, and I'm sorry to keep repeating myself, the language of the statute says that the assisted family may elect to remain. And that's that short phrase, the may elect to remain, is where this whole body of HUD guidance ends. And if they want to remain, and if the landlord wants them to remain, then they're entitled to an enhanced voucher. Correct. I think everyone agrees on that. Correct. But that all presupposes that the landlord and tenant want to continue with the relationship. There's nothing that requires that that relationship continue in perpetuity. Is there? Well, we believe that the language of the statute and HUD guidance following that statute, which specifically says that the right to remain extends beyond the initial year of the lease, and that owners must continually renew the lease of an enhanced voucher tenant, says that the right that Apelli says only exists at the time of opt-out. So even Apelli concedes that at the time of opt-out, a landlord must continue to rent to an enhanced voucher tenant if the enhanced voucher tenant wants to stay. Now, many tenants, when their project-based owner opts out, says, I'm going to move with my voucher. And so they leave. Many units are vacant at that time, and so those become market rent. But tenants who are still there and want to stay, the statute, the letter, the one-year notice letter that is sent to the tenants, HUD guidance, and the courts have all said that they have to stay at that point. But doesn't that section really just refer to the amount that HUD has to pay? No. And the courts, again, this is an issue that's been raised, and the courts have unanimously said that an owner must continue to rent to these tenants. The other courts have said that. Correct. There's nothing in the Third Circuit. But it talks about, the language it follows, talks about the amount of payment that HUD will make on an enhanced voucher. But then it says that the... I mean, NANEA has a district court in this case read it that way. That's the Apelli's argument. But that reading seems to me is consistent with what is being argued here and is consistent with the regular voucher program that says that it uses the termination, uses the language during the term of the lease that Congress ended when they eliminated the endless lease provision in 1996. But again, you have to look at the sequence of events. So first, the enhanced vouchers didn't exist when Congress got rid of the endless lease provision. Those vouchers weren't even created. They didn't reinstate specifically with language to provide for that endless lease again. But it wouldn't make sense. I mean, if you already have a project-based landlord who has to send a one-year notice, you're already giving the tenants a year notice that a year from now it's not going to be project-based. Why require them, why give enhanced vouchers at all? Why not just say a year from now... Because the landlord might like the tenants and say, hey, this is a win-win. You know, we have a good relationship. And the government, even though I could go to the private market and get two or three times what I would typically get from the government, this is a great thing because the government is actually going to pay me a market rent. And I get to keep this great relationship going. And I don't, as Judge Greenway said, I don't suffer any financial detriment. And the tenant gets better housing. I mean, it serves the purposes. Unfortunately, the statute goes further than that. The statute doesn't just say this is optional for the landlord. The statute says that the tenant may elect to remain. It is the choices on the tenant whether or not to stay. It is not on the owner. That's a decision. That's what we have to decide. Correct. That's your position. And I think we understand it. And you argued it well. And do you have another question? Well, that just sounded like such a great summation that maybe we should end. But it was just a suggestion. So, yes, I do. Actually, I'm going to let it. Well, actually, the question I was going to ask is, the language that you allude to is, as you presupposed, one-sided. That is, the tenant may elect. There is no corollary giving any discretion to the landlord, right? Correct. Okay, good. All of the language of the statute, the guidance, and the courts are about the relationship between the assisted tenant family to that unit. It doesn't extinguish upon choice by the landlord or a change in ownership of the landlord. Good, okay. Thank you. Okay, thanks. Thank you, Ms. Garland. And we thank both counsel for the case. It was very well briefed and argued. And we take the matter under advisement.